[No. 7421-4-II. Division Two. March 7, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. DALE D. TRAWEEK, *Appellant.*

*Richard C. Adamson,* for appellant (appointed counsel for appeal).

*Gary P. Burleson, Prosecuting Attorney,* and *Walter H. Perry, Deputy,* for respondent.

WORSWICK, C.J.—Dale Traweek appeals his conviction of second degree robbery, RCW 9A.56.210, contending that the trial court erred in permitting the victim to testify that she identified Traweek in a police lineup and in admitting evidence that he was involved in a plan to raid a marijuana farm, and that prosecutorial misconduct denied him a fair trial. We affirm.

Shortly before midnight on June 15, 1983, two young men entered Bob's General Store in Belfair, Washington, just as the last customers were leaving. The clerk on duty watched them walk to the cooler in the back of the store. When they reached the cooler, which was about 75 feet from the clerk's station at the check-out counter, the taller of the two turned to her and asked where he could find sandwiches. She directed him to a cooler compartment and then began to refill the coffee machine at the counter. A sudden movement caused her to look up; the tall young man was standing directly in front of her. He ordered her to lie on the floor, saying he had a gun.

The clerk immediately dropped to the floor. She could see nothing, but she heard the men open the cash register, which contained some bills and a quantity of change. She felt them go through her pockets and remove her wallet. She heard the tall young man say to the other, "Don't load it, Jim." Finally, she heard them leave, laughing uproariously.

When she was sure they were gone, she got up and called the police. She described the tall robber as 6 feet tall, blond, and wearing blue jeans and a blue shirt with white stripes at the shoulders. She described "Jim," his companion, as being about 5 feet 9 inches tall, blond, and wearing blue jeans and a black leather jacket.

About 2 hours later, Shelton police officers spotted two men matching the clerk's description getting out of a car at a gas station. Dale Traweek, a blond 6–footer, was wearing blue jeans and a black leather jacket. Jim Vaughn, about 5 feet 9 inches tall, was wearing blue jeans and a shirt turned inside out—the shirt was blue with white stripes at the shoulders. The officers suspected these men were the robbers, arrested them, and put them in separate patrol cars while they turned their attention to the driver of the car, Ronald White. White admitted to being Vaughn's friend, but insisted that he had picked up Traweek and Vaughn hitchhiking just a short while before. He denied having any knowledge of a robbery. However, he could not remember what road he had taken into Shelton, nor the towns through which he had passed. The officers suspected that White was lying, but released him because they lacked probable cause for arrest.

After White left, the officers took Traweek and Vaughn to the police station and booked them. Later, officers found a large number of quarters, dimes and 50–cent pieces in the patrol car in which Vaughn had waited while the officers questioned White.

Traweek and Vaughn were jointly charged with second degree robbery. In a pretrial hearing, Traweek moved unsuccessfully to suppress evidence that the store clerk identified him in a police lineup 2 days after the robbery. At trial, the clerk testified to the circumstances of the robbery, and testified that she had immediately recognized Traweek as the tall robber when she viewed him in a lineup. The detective who conducted the lineup also testified to her immediate recognition of Traweek.

Police officers testified about the appearance of Traweek and Vaughn at the time of their arrest, and about the quantity of change found in the patrol car where Vaughn had waited. A fingerprint analyst testified that fingerprints found on the store's cooler matched Vaughn's.

Ronald White testified for the State under a grant of immunity. He recanted the story he had originally told

police, and admitted that he had been with Traweek and Vaughn most of the day of the robbery. He testified that the three of them had driven to Port Orchard intending to raid a marijuana farm. He said that they abandoned this plan and drove to Belfair, where he dropped them at Bob's General Store. He related that Traweek and Vaughn told him that they intended to buy sandwiches and steal beer, but that when they came out of the store, they boasted that they had robbed the clerk. White testified that on hearing this, he told them to get out of his car. He drove away intending to abandon them, but changed his mind after a few minutes, and returned to pick them up. They eventually drove to the Shelton gas station, where police spotted Traweek and Vaughn.

The jury convicted both Vaughn and Traweek of second degree robbery. Only Traweek appeals.

Traweek argues first that the court should have suppressed testimony of the clerk's lineup identification. He asserts that the lineup was unnecessarily suggestive, as he was the only blond participant.

A defendant asserting that a police identification procedure denied him due process must show that the procedure was unnecessarily suggestive. *Foster v. California,* 394 U.S. 440, 22 L. Ed. 2d 402, 89 S. Ct. 1127 (1969); *Stovall v. Denno,* 388 U.S. 293, 18 L. Ed. 2d 1199, 87 S. Ct. 1967 (1967). Once he makes his showing, the court reviews the totality of circumstances to determine whether the suggestiveness created a substantial likelihood of irreparable misidentification. *Manson v. Brathwaite,* 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977); *State v. Hewett,* 86 Wn.2d 487, 545 P.2d 1201 (1976).

We agree with Traweek that the lineup was unnecessarily suggestive. Once the store clerk described the tall robber as blond, it was unfair not to include in the lineup at least one other blond man. Traweek was, in fact, the only blond participant and thus the only possible choice. Further, the State has made no showing that suggestiveness was necessary. Traweek has met the first part of the due process test.

However, having reviewed the totality of the circumstances, we conclude that the lineup identification was reliable despite the flaw. In reaching this conclusion, we rely on the five factors suggested by the court in *Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972):

1. The opportunity of the witness to view the criminal at the time of the crime;

2. The witness's degree of attention;

3. The accuracy of the prior description given by the witness;

4. The level of certainty demonstrated by the witness at the confrontation; and

5. The length of time between the crime and the confrontation. *Accord, State v. Christianson*, 17 Wn. App. 264, 562 P.2d 671 (1977). Under the *Biggers* test, the clerk's identification was reliable.

First, she got a good look at Traweek the night of the crime. He and Vaughn were the only customers in the store, which she testified was well lit. Not only did Traweek face her from the cooler, but they were face to face when he ordered her to lie on the floor. Second, she testified that she watched the two men closely from the moment they entered the store, partly because their manner was odd, and that when Traweek came up to her she was staring at his face. Third, her description of the robbers was accurate. When Traweek and Vaughn were arrested at Shelton, their appearance differed from her description in just one detail. Vaughn, not Traweek, was wearing the blue shirt with white stripes. However, he was wearing it inside out. This circumstance indicates that the men had simply exchanged clothes. Fourth, the clerk identified Traweek at the lineup positively and immediately. Fifth, the lineup took place less than 48 hours after the crime. The suggestiveness of the lineup did not create a substantial likelihood of misidentification.

Traweek next contends that the court erred in permitting White to testify that he and the defendants planned to raid a marijuana farm the day of the robbery. He asserts that

the testimony was barred by ER 404(b), which provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

■ Evidence is admissible under ER 404(b) if (1) it is logically relevant to a material issue before the jury, and (2) its potential for prejudice does not substantially outweigh its probative value. *State v. Saltarelli*, 98 Wn.2d 358, 655 P.2d 697 (1982). The trial court must weigh prejudice against probative value on the record. *State v. Jackson*, 102 Wn.2d 689, 689 P.2d 76 (1984). We will review the trial court's determination only for abuse of discretion. *State v. Laureano*, 101 Wn.2d 745, 682 P.2d 889 (1984).

The State contends that White's testimony about the planned raid on the marijuana farm was relevant because it placed the robbery in context. It contends further that the testimony was necessary to give substance to White's claim that he had spent the day with Traweek and Vaughn. This claim was subject to attack by the defense, because White's credibility was in doubt. Not only was he testifying under a grant of immunity, but he had recanted the story he initially gave police.

We agree with the State that this testimony had some probative value. It established the chain of events that led to the robbery later the same day, and placed the defendants near Belfair the day of the robbery. *See State v. Tharp*, 96 Wn.2d 591, 637 P.2d 961 (1981) (evidence of uncharged crimes committed same day as charged crime admissible as part of unbroken sequence of incidents tied to defendant).

Further, we cannot say that the prejudicial effect, if any, of the testimony substantially outweighed its probative value. White's reference to the marijuana farm was made in passing; the State did not refer to it in closing argument, or otherwise use it to influence the jury. Further, White's tes-

timony made it clear that the three of them voluntarily abandoned the plan to raid the farm. Therefore, we do not think that the bare mention of their plan set the jury against Traweek.

█ █ Assuming, but not deciding, that the trial court erred in failing to balance prejudice against probative value on the record (*State v. Jackson, supra*), the error was harmless in light of the evidence against the defendants. Error in admitting evidence under ER 404(b) is not of constitutional magnitude; therefore, reversal is required only if, within reasonable probabilities, the trial's outcome would have been different had the error not occurred. *State v. Jackson, supra.* The evidence of Traweek's guilt was overwhelming. The robbery victim positively identified him as the perpetrator; her initial description of the two robbers matched Traweek and Vaughn when they were arrested 2 hours after the crime; Vaughn's fingerprints were found on the cooler in the store. Most damning, perhaps, was White's testimony that he dropped the two off at Bob's General Store at the exact time the crime was committed, and that they later told him they robbed the store. It is inconceivable that error, if indeed there was any, concerning this testimony affected the verdict.

Finally, Traweek contends that prosecutorial misconduct denied him a fair trial because of the following two statements made by the prosecutor in closing argument:

> Mr. Traweek doesn't have to take the stand and you can't hold that against him. That doesn't mean the defense counsel can't put other witnesses on if they have explanations for any of these questions, any of this evidence. Where has it been? Why hasn't it be [*sic*] presented if there are explanations, which there aren't? . . .

> Use your common sense. You know what happened. I know what happened, and I know who did it, and there were three people involved in this. There are two of them on trial right now. There was Mr. White, Mr. Traweek, and Mr. Vaughn. There is little doubt about that. We are trying Mr. Traweek and Mr. Vaughn.

We agree with Traweek that both statements were impro-

per.

The State argues that the first statement was permissible because it did not characterize unfavorably the defendant's failure to testify, which it admits would be improper. Rather, it emphasized the absence of any defense witnesses, which the State contends is proper. We disagree.

First, it is for the court, not the prosecutor, to instruct the jury on the defendant's right not to testify. The prosecutor's statement unavoidably drew attention to the failure of the defendant to testify.

Second, a defendant has no duty to present any evidence. The State bears the entire burden of proving each element of its case beyond a reasonable doubt. *See In re Winship,* 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068 (1970). The prosecutor's statement suggested that the defendant was obliged to call witnesses and thus to prove his innocence. There was no such duty.

The State contends that *State v. Crawford,* 21 Wn. App. 146, 584 P.2d 442 (1978) supports its position. We disagree. *Crawford* did nothing more than reiterate that the State may argue the fact that its evidence is unrefuted, even though it thereby subtly alludes to the absence of a defense. Thus, it is proper for the State to comment *on its own evidence.* It is not proper for the State to comment on a failure of the defense to do what it has no duty to do.

The State concedes, as it must, that the prosecutor should not have told the jury that he "knew" Traweek and Vaughn committed the crime. Any attempt by the prosecutor to impress upon the jury his personal belief in the defendant's guilt is unethical and prejudicial. *State v. Reed,* 102 Wn.2d 140, 684 P.2d 699 (1984); Rule of Professional Conduct 3.4(f) (formerly Code of Professional Responsibility DR 7–106(C)(4)). The prosecutor's gratuitous injection of prejudice endangered a strong case. *See State v. Claflin,* 38 Wn. App. 847, 855, 690 P.2d 1186 (1984) (Worswick, A.C.J., concurring), *review denied,* 103 Wn.2d 1014 (1985).

The remaining question is whether the improper comments require us to reverse the conviction. Improper

comments by a prosecutor deny the defendant a fair trial and require reversal of his conviction if there is a substantial likelihood that the comments affected the verdict. *State v. Reed, supra; State v. Davenport,* 100 Wn.2d 757, 675 P.2d 1213 (1984). When a comment also affects a separate constitutional right, such as the privilege against self–incrimination, it is subject to the stricter standard of constitutional harmless error. *Davenport,* 100 Wn.2d at 761 n.1. That is, we must reverse unless we are convinced beyond a reasonable doubt that the evidence is so overwhelming that it necessarily leads to a finding of guilt. *State v. Guloy,* 104 Wn.2d 412, 705 P.2d 1182 (1985). We are arguably required to apply the constitutional harmless error standard because the comment regarding Traweek's failure to testify affected his privilege against self–incrimination.

We are convinced that the conviction should be affirmed regardless of the standard we apply.

First, the evidence against Traweek was overwhelming; his guilt was established to a virtual certainty. In our view, nothing short of a "jury pardon" would have saved him.

Second, the jury instructions negated the prejudicial effect of the improper remarks. Instruction 6 forbade the jury to consider the failure of the defendant to testify. Instruction 14 stated that the prosecution had the burden of proving each element of the crime beyond a reasonable doubt; further, it stated that a reasonable doubt could arise from the evidence *or lack of evidence.* This instruction made it clear that the jury could harbor a reasonable doubt even if the defendant produced no evidence. We presume that the jury followed the instructions. *State v. Grisby,* 97 Wn.2d 493, 499, 647 P.2d 6 (1982), *cert. denied,* 459 U.S. 1211 (1983).

Third, the court promptly granted a defense motion to strike the prosecutor's statement that he "knew" Traweek committed the crime. He also instructed the jury to disregard the remark. This action minimized the prejudicial effect of the error. *See Davenport,* 100 Wn.2d at 762.

In sum, we find that the improper remarks made by the prosecutor in closing argument did not prejudice the defense.

Affirmed.

REED and PETRICH, JJ., concur.

Reconsideration denied April 22, 1986.

Review denied by Supreme Court July 8, 1986.