[No. 15783-3-I. Division One. March 30, 1987.]

THE STATE OF WASHINGTON, *Respondent*, v. LUIS GUZMAN-CUELLAR, *Appellant*.

*Neil M. Fox* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Barbara Linde, Deputy,* for respondent.

RINGOLD, A.C.J.—Luis Guzman–Cuellar appeals from a judgment and sentence entered after a jury conviction of murder in the first degree.

On the evening of July 1, 1984, six people were at the Duchess Tavern in Seattle. The people included the bartender, Robert Van Syoc; four regular patrons, Donna Stake, David Scott Hartshorn, James Hatch and Patrick Thornton; and a stranger, Luis Guzman–Cuellar (Guzman).

Guzman participated in a game of pool with Van Syoc, Thornton and Hatch in which he lost two dollars. The game appeared to be friendly and no hostilities were evident. Thornton went over to Guzman to collect the two dollars after the game. They were observed speaking to each other but no money was seen changing hands. Guzman left the tavern.

Shortly thereafter, around 1:50 a.m., someone burst through the front door of the tavern, fired a pistol and fled. Thornton was hit in the back by the shot and later died due to the wound. Van Syoc, Hatch and Hartshorn all recognized the assailant as the same person with whom they had played pool earlier that evening. Stake did not recall seeing the assailant prior to the shooting. The police were summoned and obtained a description of the assailant. The following description was broadcast to all police cars about 2 a.m.:

Mexican or Cuban male, 30–33, 5'4", 120 lbs., medium or dark complexion, wearing a white sweatshirt with cutoff

sleeves and a brown fedora hat, having long, dark curly hair, a beard, a mustache or goatee and a mole or scar or birthmark on his nose, possibly on a ten speed bicycle, heading in an unknown direction.

Officer John Guich was patrolling the area near the tavern when he heard the broadcast. At about 2:30 a.m., Guich was approximately three–fourths of a mile from the tavern when he spotted an individual walk out of a residential driveway, cross the street and enter another yard walking between a fence and a garage. Though Guich had not received any report of trespassing that evening, his first reaction was that the individual might be a prowler. He called to the individual to come over to the car.

Despite a language barrier, Guich was able to ascertain that the individual, Guzman, lived approximately ten blocks away and was new to the area. After a short while, Guich recognized that Guzman's appearance matched that of the shooting suspect in several respects. Guich patted down Guzman and handcuffed him, and waited for another police unit.

After the backup unit arrived, Guich continued with the trespass investigation. He ascertained that Guzman did not have permission to be in the yard where he was stopped. Guzman was arrested for criminal trespass.

At this point, Guzman was turned over to the other police unit for transport to the tavern for a showup. Van Syoc and Hartshorn identified Guzman as the man with whom they played pool earlier and the one who shot Thornton. Stake asserted that Guzman looked "real familiar" and that she was 80 percent sure he was the assailant. Hatch did not take part in the showup and had his first opportunity to identify Guzman as the assailant at trial.

Guzman was taken to the police station for interrogation. After waiving his rights, Guzman admitted going to the tavern and playing pool. He denied being the assailant.

Two days after the shooting, a pistol with a broken handle was found inside a glove lying on the front lawn of the residence where Guzman was initially stopped. The gun

was later identified as the murder weapon. Martin Easterling, a bartender at another tavern, testified that this pistol was the same one he had seen Guzman carrying in a glove in the waistband of his pants weeks before the shooting.

After a trial by jury, Guzman was convicted of murder in the first degree as charged. The jury also returned a special verdict that he was armed with a deadly weapon.

Guzman appeals asserting a number of errors.

### PROPRIETY OF INITIAL STOP

Guzman argues that he was illegally seized when Officer Guich asked him to stop and come over to the police car. Guzman maintains that the officer lacked a reasonable objective suspicion of criminal activity that would justify an investigatory stop. He contends that traveling on foot from one private yard to another is quite consistent with a number of lawful and normal actions. He argues that the investigatory stop and subsequent arrest for criminal trespass were not warranted and were merely utilized as a pretext to detain him to facilitate the murder investigation.

To justify an investigatory stop, an officer must have "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *State v. Kennedy,* 107 Wn.2d 1, 5, 726 P.2d 445 (1986); *State v. Williams,* 102 Wn.2d 733, 739, 689 P.2d 1065 (1984). Officer Guich observed a man leave the driveway of one residence, cross the street and enter the fenced side yard of another residence shortly after 2 a.m. He thought the man might be a prowler.[1] These facts were sufficient to warrant an investigatory stop.

Citing *State v. Larson,* 93 Wn.2d 638, 645, 611 P.2d 771 (1980), Guzman argues that the fact that the officer observed this activity in the early morning hours is irrelevant to the determination of the propriety of the initial

---

[1] RCW 9A.52.080(1) states: "A person is guilty of criminal trespass in the second degree if he knowingly enters or remains unlawfully in or upon premises of another . . ."

stop. Guzman maintains that *Larson* stands for the proposition that mere presence in a high crime area during such hours does not justify an investigatory stop.

*Larson* is inapplicable to this situation where early morning presence is supplemented by observations that could justify an inference that a crime had or was about to occur. The suspicious nature of the activity may be considered in conjunction with the time of occurrence.

Likewise, the fact that the police had not received a report of prowling in the area is not dispositive. It is generally recognized that crime prevention and detection are legitimate purposes for an investigatory stop. *State v. Kennedy, supra* at 5–6; 3 W. LaFave, *Search and Seizure* § 9.2 (1978). The police should not be required to wait for a crime report before being permitted to stop an individual to investigate suspicious activity evidencing commission of a crime.

Guzman also argues that the stop was unlawful because it is a defense to criminal trespass if the "actor reasonably believed that the owner of the premises . . . would have licensed him to enter or remain." Former RCW 9A.52-.090(3). Guzman contends that Officer Guich did not consider the possible applicability of this defense before stopping him.

To justify the stop, Officer Guich needed only specific and articulable facts which, taken together with rational inferences from those facts, would reasonably warrant the intrusion. *Terry v. Ohio, supra* at 21; *State v. Kennedy, supra* at 5. Officer Guich had such facts before him and did not need to determine the absence of a defense prior to conducting the investigatory stop.

The stop of Guzman was reasonable under both article 1, section 7 of the Washington Constitution and the fourth amendment to the United States Constitution. *State v. Kennedy, supra* at 13.

### Scope of the Investigatory Stop

In assessing the proper scope of the intrusion under the

federal and state constitutions, our Supreme Court has set forth three factors for consideration: (1) the purpose of the stop; (2) the amount of intrusion upon the suspect's liberty; and (3) the length of time the suspect is detained. *State v. Williams, supra* at 740; *State v. Wheeler,* 43 Wn. App. 191, 196, 716 P.2d 902, *review granted,* 106 Wn.2d 1001 (1986).

■ The initial purpose of the stop in this case was to ascertain if Guzman was a prowler. The scope of an investigatory stop, however, may be enlarged or prolonged as required by the circumstances if the stop confirms or arouses further suspicions. *State v. Davis,* 3 Conn. App. 359, 488 A.2d 837, 840 (1985); *State v. Merklein,* 388 So. 2d 218, 219 (Fla. Dist. Ct. App. 1980), *review denied,* 392 So. 2d 1377 (1981); *People v. Hardy,* 142 Ill. App. 3d 108, 491 N.E.2d 493, 498 (1986); W. LaFave & J. Israel, *Criminal Procedure* § 3.8, at 298 (1984). Upon recognizing Guzman as a possible murder suspect, the scope of the investigatory stop broadened. As a lone officer in that situation, Officer Guich acted reasonably in patting down and handcuffing Guzman. *State v. Williams, supra* at 740 n.2; *State v. Sweet,* 44 Wn. App. 226, 235, 721 P.2d 560 (1986); *State v. Wakeley,* 29 Wn. App. 238, 243 n.1, 628 P.2d 835 ("handcuffing may be 'reasonable, as a corollary to the lawful stop.'"), *review denied,* 95 Wn.2d 1032 (1981).

Given the purpose of the initial stop and the facts that the stop revealed, Officer Guich's actions did not exceed the proper scope of an investigatory stop.

### TRANSPORT TO THE SHOWUP

After Guich arrested Guzman for criminal trespass, he turned him over to the other police unit for transportation to the tavern for a showup. Guzman and the officers arrived at the tavern approximately 10 to 25 minutes after the initial investigatory stop by Officer Guich. Guzman argues that the transport to the showup was unlawful because the officers lacked probable cause to arrest him for the murder.

■ As stated in *Commonwealth v. Lumb,* 288 Pa. Super. 11, 430 A.2d 1188 (1981):

where, as here, a valid custodial arrest is made and the arrested person is subjected to identification proceedings related to an entirely separate criminal incident . . . the police must have probable cause to arrest for the other crime *or at the very least sufficient reasonable suspicions to warrant that they undertake an "intermediate response."* Such a "response" would allow the police to transport the suspect to some location for the purpose of making an identification.

(Italics ours.) *Lumb,* at 17.

The officers in this case had reasonable suspicions to warrant transporting Guzman to the tavern. They transported him the three-fourths of a mile to the tavern less than 1 hour after the murder. A showup held shortly after a crime is committed and in the course of a prompt search for the suspect is permissible. *State v. Booth,* 36 Wn. App. 66, 71, 671 P.2d 1218 (1983); *State v. Kraus,* 21 Wn. App. 388, 392, 584 P.2d 946 (1978). Prompt transport of Guzman to the tavern was "the least intrusive means reasonably available to verify or dispel" the officers' suspicion in a short period of time. *State v. Williams, supra* at 738; *State v. Wheeler, supra* at 198. Accordingly, the transport was lawful.

## RIGHT TO COUNSEL AT SHOWUP

Guzman concedes that he did not have a right to counsel at the showup under the Sixth Amendment. *Kirby v. Illinois,* 406 U.S. 682, 689–90, 32 L. Ed. 2d 411, 92 S. Ct. 1877 (1972); *State ex rel. Juckett v. Evergreen Dist. Court,* 100 Wn.2d 824, 828, 675 P.2d 599 (1984); *State v. Hoffpauir,* 44 Wn. App. 195, 200, 722 P.2d 113 (1986). He maintains, however, that under CrR 3.1(b), (c), he had a right to counsel as soon as he was taken into custody. Though he did not raise this argument at trial, Guzman attempts to preserve the issue for appeal by arguing that the expanded right to counsel is based upon article 1, section 22 (amendment 10) of the Washington Constitution and, therefore, violation of the rule can be raised for the first time on appeal.

The pertinent portions of CrR 3.1 state:

When a person is taken into custody he shall immediately be advised of his right to counsel. Such advice shall be made in words easily understood, and it shall be stated expressly that a person who is unable to pay a lawyer is entitled to have one provided without charge.

Former CrR 3.1(c)(1).

The right to counsel shall accrue as soon as feasible after the defendant is taken into custody, when he appears before a committing magistrate, or when he is formally charged, whichever occurs earliest.

Former CrR 3.1(b)(1). Identical counterparts to those rules can be found in the Justice Court Criminal Rules. *See* JCrR 2.11(b)(1), (c)(1). Despite Guzman's protestations to the contrary, there appears to be no basis in our courts' opinions for concluding that these court rules are of constitutional dimension.

Recently, in *Heinemann v. Whitman Cy.*, 105 Wn.2d 796, 718 P.2d 789 (1986), the court reaffirmed the notion that the right to counsel under our constitution is coextensive with the federal right. The court stated: "it is only at a critical stage that the Sixth Amendment and Const. art. 1, § 22 (amend. 10) right to counsel is provided in order to ensure the effective preservation and preparation of defenses to the charges." *Heinemann*, at 800.

After concluding that the conducting of field sobriety tests in that case did not violate the federal or state constitutions despite the absence of counsel, the court then considered whether it violated JCrR 2.11(c). *Heinemann*, at 801. The court noted that the court rule "goes beyond the requirements of the constitution." *Heinemann*, at 802.

It appears that the court rules on which Guzman attempts to rely are not of constitutional origin. Guzman did not raise this error at the trial court and we refuse to consider it on appeal. RAP 2.5(a).

## SUGGESTIVENESS OF SHOWUP

Guzman argues that the showup conducted at the tavern was impermissibly suggestive and violated his due process

rights. To support his contention, he points specifically to the fact that he was shown to three of the four eyewitnesses while in handcuffs standing next to a police car.

Two of the eyewitnesses, Hartshorn and Hatch, identified Guzman as the man they had seen in the tavern earlier in the evening, and as the assailant. In a written statement, Guzman admitted having been in the tavern playing pool prior to the shooting. Since Hartshorn and Hatch based their identification on their earlier contact with Guzman, and Guzman admitted that he was that individual, any suggestiveness in the showup would be harmless in regard to those witnesses.

Only the identification by Stake could have been adversely affected by any suggestiveness in the showup procedure. Stake testified that she had not seen Guzman until he appeared in the doorway and shot Thornton. Consequently, she was not basing her identification of Guzman upon her prior contact with him, but solely upon what she perceived at the time of the shooting. Her identification of Guzman, therefore, could have been tainted by a suggestive showup.

A suggestive procedure such as a showup is not per se impermissibly suggestive. *Neil v. Biggers,* 409 U.S. 188, 198, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972); *State v. Rogers,* 44 Wn. App. 510, 515, 722 P.2d 1349 (1986). A defendant asserting that a police identification procedure denied him due process must show that the procedure was unnecessarily suggestive. *Foster v. California,* 394 U.S. 440, 442, 22 L. Ed. 2d 402, 89 S. Ct. 1127 (1969); *State v. Traweek,* 43 Wn. App. 99, 103, 715 P.2d 1148 (1986); *State v. Booth,* 36 Wn. App. 66, 70, 671 P.2d 1218 (1983). Once such a showing is made, the court will consider the totality of the circumstances to determine whether the suggestiveness created a substantial likelihood of irreparable misidentification. *Manson v. Brathwaite,* 432 U.S. 98, 116, 53 L. Ed. 2d 140, 97 S. Ct. 2243 (1977); *State v. Traweek, supra* at 103. This court need not review the totality of the circumstances because Guzman has failed to make the preliminary showing that the showup was unnecessarily suggestive.

The thrust of Guzman's argument is that he was handcuffed and standing approximately 15 feet from the police car during the showup. These facts alone are insufficient to demonstrate unnecessary suggestiveness. *See United States v. Hines,* 455 F.2d 1317 (D.C. Cir. 1971) (showup was not unduly suggestive even though robbery suspect was handcuffed and a number of policemen were present). Accordingly, the trial court did not err in admitting evidence of the showup.

## Jury Instructions

At trial, Guzman proposed a jury instruction that cautioned the jury on the reliability of eyewitness identification testimony. The instruction indicated that the jury must be satisfied beyond a reasonable doubt of the accuracy of the identifications and that they should consider such factors as the opportunity to observe the offender, time lapses, lighting and other relevant factors. The instruction was derived from that found in *United States v. Telfaire,* 469 F.2d 552 (D.C. Cir. 1972). Guzman argues that it was error for the trial court to refuse to give such an instruction in a case such as this where the danger of misidentification is great.

The Washington courts have consistently rejected use of *Telfaire* instructions. *See, e.g., State v. Laureano,* 101 Wn.2d 745, 768, 682 P.2d 889 (1984); *State v. Ammlung,* 31 Wn. App. 696, 701, 644 P.2d 717 (1982); *State v. Edwards,* 23 Wn. App. 893, 897, 600 P.2d 566 (1979). The rationale for this rejection was most recently stated in *State v. Hall,* 40 Wn. App. 162, 697 P.2d 597, *review denied,* 104 Wn.2d 1001 (1985).

> We find the court's rejection of the defendant's proposed instruction was not prejudicial. The court's general instructions on the "beyond a reasonable doubt" standard enable the defendant to argue his theory of the case and to attack the credibility of eyewitnesses.

*Hall,* at 167.

The rationale explicated in *Hall* is applicable to the case

sub judice. The factors that could affect the accuracy of the eyewitness identifications are best left to argument by counsel. It should be noted that just such arguments were made to the jury by Guzman's trial counsel. The trial court did not err in refusing the proposed instruction.

### ADMISSION OF AUTOPSY PHOTOGRAPHS

Guzman next argues that admission of autopsy photographs of the victim was error. He maintains that the photos were inflammatory and the information gleaned from them could have been illustrated through the use of diagrams.

A trial court's admission of photographs will not be disturbed on appeal absent a showing of abuse of discretion. *State v. Cummings,* 44 Wn. App. 146, 151, 721 P.2d 545 (1986). Even gruesome or unpleasant photographs are admissible if the trial court finds that their probative value outweighs their prejudicial effect. *State v. Harris,* 106 Wn.2d 784, 791, 725 P.2d 975 (1986).

The two photographs at issue here show the entrance and exit wounds of the victim. The entrance wound is illustrated by a photograph of the victim's body from the rear depicting a small wound in the back. The exit wound is illustrated by a photograph of the victim from the side showing a small bullet wound in the chest. To avoid inflaming the jury, the photograph of the exit wound was cropped so that only the portion of the photo depicting the victim's upper torso was admitted. The victim's face and the remainder of the body were not visible.

As provided to the jury, neither of the photographs are particularly gruesome. This case is unlike *State v. Sargent,* 40 Wn. App. 340, 347, 698 P.2d 598 (1985) where the photographs were so repulsive that one juror had to be removed because she could not look at them.

The trial judge admitted these photographs for the purpose of supplementing the medical examiner's testimony regarding the path of the bullet through the victim's body. While this evidence could have been illustrated by a dia-

gram, the record supports the trial court's decision and, therefore, the admission of the photographs was not an abuse of discretion. *State v. Harris, supra* at 792.

## PROSECUTOR'S CLOSING ARGUMENT

Guzman contends that certain statements made by the prosecutor during closing argument denied him a fair trial. Of the five allegedly improper statements, Guzman failed to object to four of them at trial.

The general rule is that improper argument cannot be urged as error on appeal unless the aggrieved party requested the court to correct it by instructing the jury to disregard it. *State v. Case,* 49 Wn.2d 66, 72, 298 P.2d 500 (1956); *State v. Monk,* 42 Wn. App. 320, 324–25, 711 P.2d 365 (1985). The only exception is "in cases where the misconduct has been so flagrant that no instruction could cure it." *Case,* at 72; *Monk,* at 325.

The four statements that were not objected to at trial were that this was an "open and shut case", that the murder was a "cold–blooded premeditated decision", that the prosecutor would "feel perfectly comfortable" convicting Guzman even without the eyewitness testimony, and that "the police did a wonderful job in this case." While the propriety of some of these comments could be questioned, they are not so flagrant that no instruction could cure them. Consequently, Guzman may not raise these alleged errors on appeal. *State v. Monk, supra* at 325; *State v. Claflin,* 38 Wn. App. 847, 849 n.2, 690 P.2d 1186 (1984), *review denied,* 103 Wn.2d 1014 (1985); *State v. Peyton,* 29 Wn. App. 701, 712, 630 P.2d 1362, *review denied,* 96 Wn.2d 1024 (1981).

Though the four statements above were not objected to at trial, Guzman did timely object to the fifth statement in the following colloquy:

[Prosecutor]: There is no testimony in this trial about what kind of animosity the defendant left the tavern with, and the reason there is no testimony about it is because the only man that could give you that kind of testimony, what transpired in that conversation—

[Defense]: I object to this line of argument, your Honor.

THE COURT: This is argument. The jury will understand it's argument. Overruled.

[Prosecutor]: The only man that could give you that testimony is dead.

[Defense]: I object on the grounds—

THE COURT: Yes?

[Defense]: On the grounds its implying of the defendant's failure to take the stand.

THE COURT: Overruled.

As he did at trial, Guzman maintains on appeal that the prosecutor's statement was an impermissible reference to his failure to take the stand. A fair reading of the prosecutor's comment in context does not support such an argument. While Guzman's attorney might have been warranted in assuming that the prosecutor was about to comment on Guzman's failure to testify, she did not. Accordingly, the argument was not improper.

EXHIBITION OF GUZMAN'S TEETH

At trial, the prosecutor requested that the court order Guzman to exhibit his teeth to the jury. The following colloquy took place:

[Defense]: Your Honor, I would just ask what is the relevance of this? I don't recall any, any testimony about teeth.

THE COURT: Well, there has been some questions whether somebody noticed anything about his teeth or not.

[Prosecutor]: The bartender, Mr. Bob Van Syoc, gave that description immediately, and for the Court's ability to note its relevance, I would ask the defendant to show his teeth to the Court so that you could determine it. I certainly have been noting during the course of the trial and would like the record to reflect that he is missing some front teeth and it is quite apparent when he opens his mouth.

THE COURT: All right. The Court will rule that it's nontestimonial and nonprivileged. He will display his teeth.

Guzman concedes that the showing of his teeth was non-

testimonial and nonprivileged. He argues, however, that the evidence was not relevant under ER 401 and even if it was its probative value is outweighed by its prejudicial effect. ER 403.

When identity of the perpetrator of a crime is in issue, any evidence tending to identify the accused as the guilty party is relevant. *State v. Coe,* 101 Wn.2d 772, 781–82, 684 P.2d 668 (1984); *State v. Sellers,* 39 Wn. App. 799, 805, 695 P.2d 1014 (1985). Here the identity of the assailant was in issue. Van Syoc testified that Guzman had poor and missing teeth, but his knowledge of this detail was based upon his contact with Guzman prior to the shooting. Since there is no evidence that any of the witnesses saw the assailant's teeth at the time of the shooting, displaying Guzman's teeth to the jury would not tend to identify him as the assailant, but merely confirm his identify as a patron of the tavern. Nonetheless, the condition of Guzman's teeth is highly relevant to the assessment of Van Syoc's skills as an observer. If his description of Guzman's teeth proved to be accurate, it would tend to enhance the credibility to be accorded Van Syoc's observations at the time of the shooting. While displaying Guzman's teeth could potentially mislead the jury to believe that Van Syoc saw the assailant's teeth, we cannot say that, on balance, the trial court abused its discretion in admitting such evidence. *State v. Gatalski,* 40 Wn. App. 601, 610, 699 P.2d 804 (1985).

We affirm the judgment and sentence.

PEKELIS, J., concurs.
WILLIAMS, J., concurs in the result.

Reconsideration denied May 7, 1987.

Review denied by Supreme Court July 1, 1987.