IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 40192-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES GREGORY JACKSON, JR., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, A.C.J. — Following a jury trial, James Gregory Jackson, Jr. was convicted of first degree robbery, obstructing a law enforcement officer, and resisting arrest. He raises two assignments of error on appeal. First, he argues that he received ineffective assistance of counsel when his trial counsel failed to move to suppress a show-up identification shortly after the crime. Second, he contends the trial court erred by instructing the jury with 11 *Washington Practice: Washington Pattern Jury Instructions: Criminal* 4.01, at 93 (4th ed. 2016) (WPIC 4.01), which defines reasonable doubt using the phrase "abiding belief in the truth of the charge."

We affirm. Jackson fails to demonstrate that his attorney was ineffective for failing to file a motion to suppress because he cannot show that such a motion was likely to succeed. On the limited record before us, we agree that police used unnecessarily suggestive identification procedures. However, these suggestive procedures do not outweigh the reliability of the robbery victim's identification. In addition, the jury instruction was proper under binding precedent.

## BACKGROUND

The following facts are taken from evidence submitted during the jury trial in this matter.

On March 5, 2022, at approximately 10:00 p.m., A. Hoffman[1] was walking across a parking lot toward her car after getting off work. She testified that she noticed two people on longboard skateboards on a nearby trail, but did not think much about them. As she approached her car, however, she realized there was a man walking toward her only 20 feet away. The man startled her because "[i]t felt very odd for someone to be dressed in all black, hooded, and a mask on in March outside by themselves." Rep. of Proc. (RP) at 176.

Hoffman testified that she immediately felt unsafe and hurried toward her car. As her hand touched the door handle, the man she saw bolted toward her and grabbed her purse. The two then began struggling over her purse. When Hoffman began yelling for

help, the man said, "[j]ust let it go." RP at 179. During the struggle, Hoffman was inches away from the assailant's face, which was partially covered by a mask. At some point during the struggle, she observed the assailant holding his hand in his pocket in a manner that suggested he had a firearm, but she thought he was bluffing.

As Hoffman fell to the ground, she realized that a second man was now involved and recognized the two as the men on skateboards she had seen on the trail. The second man shoved her face into the ground and grabbed her phone from her hand. She testified that the defendant, Jackson was one of the men, and he stomped on her before leaving with the other man along with her purse and her phone. She testified that the attack lasted "minutes," but at least one minute.

Hoffman was able to call 911 using another person's phone. She told dispatch that the men left on longboard skateboards headed north toward the Loop trail. She described the attackers as two males, one 5'6" to 5'7" tall and the other between 5'8' and 5'11". Both men were thin, dressed in all black, wearing hooded jackets and masks, and left the parking lot riding longboards northbound.

Approximately eleven minutes after the 911 call, Officer Aly Mustain of the Wenatchee Police Department saw James Gregory Jackson, Jr. [2] less than a mile from the crime scene. Jackson was riding a longboard, dressed in all black, and wearing a mask

---

[1] Hoffman is white.
[2] Jackson is African-American.

with his hood up. When Officer Mustain activated her patrol lights, Jackson continued riding. He eventually stopped, but immediately fled on foot after being ordered to stop and comply.

Officer Mustain pursued Jackson on foot, repeatedly ordering him to stop and unsuccessfully attempting to subdue him with her taser. She testified that she eventually caught up to him, tackled him, and pinned him to the ground. She described Jackson as one hundred pounds heavier and six inches taller than her, noting that she is 5'5" and 125 pounds. An additional officer arrived to assist with the arrest. During the arrest, Jackson resisted by pulling his hands under his body, preventing the officers from handcuffing him. None of Hoffman's stolen items were found in Jackson's possession.

During the pursuit and arrest, Officer Will Lohman provided Hoffman with updates, telling her that officers were "hopefully out with him now" and later that they were "literally on top of him right now." RP at 200-01. Officer Lohman eventually informed Hoffman that an officer had caught up with "at least one of them." RP at 201.

*Show-up Identification*

Given Hoffman's proximity to the scene and the short time that elapsed since the crime, officers decided to conduct a show-up identification. Officer Lohman transported Hoffman to the location where Jackson was detained. Before walking Jackson to a place where Hoffman could view him from her vantage point in the police car, Officer Lohman informed Hoffman that he was going to show her the "suspect" and ask if she recognized

4

him, adding "[n]o pressure either way." RP at 304-05. Officer Lohman walked Jackson

approximately 20 feet away from Hoffman and shined his flashlight on Jackson. As soon

as Lohman returned to his car to ask Hoffman if she recognized Jackson, she responded,

"[t]hat's the guy that pushed me first. Yeah, that's him." RP at 305. After the

identification, Officer Mustain spoke with Hoffman and said something along the lines of

"I got to chase [or tase] the bad guy." RP at 260-61.

*Procedure*

The State charged Jackson with first degree robbery, obstructing a law

enforcement officer, and resisting arrest. Hoffman attended Jackson's initial court

appearance. She noticed him standing in the waiting room and "knew exactly who he

was." RP at 390. The case proceeded to a jury trial.

*In-trial Identifications*

During trial, the State introduced seven videos as exhibits, including two

surveillance videos and five body camera videos from law enforcement. Not all of them

were admitted into evidence, but none of these exhibits were designated as part of the

record on appeal.

Hoffman was the first witness to testify and identified Jackson, multiple times, as

one of her attackers:

- When asked about who she saw approaching her car, Hoffman testified, "I see James Jackson approaching me." RP at 175. Shortly after this response, Hoffman answered "[y]es" when asked if it was the defendant she saw. RP at 175.

5

- When asked who stomped on her, Hoffman answered, "[f]rom what I could tell, it was Mr. Jackson" who she confirmed was sitting in the courtroom. RP at 180.

- When asked if she recognized the person the officers identified during the show-up field identification and whether that person was seated in the courtroom, Hoffman answered "[y]es . . . Sitting here in front of me" and pointed at Jackson. RP at 184-85.

The trial court admitted Hoffman's out-of-court and in-court identifications without objection.

During her testimony, Hoffman acknowledged describing her attackers as "thin" and "slender" to the police shortly after the attack. However, when asked whether the defendant's build at the time of trial matched the description she gave at the time of the attack, Hoffman replied that "he's gained weight." RP at 207.

*Jury Instructions*

The State requested the jury be instructed using WPIC 4.01, which includes the following language:

> A reasonable doubt is one for which a reason exists and may arise from the evidence or lack of evidence. It is such a doubt as would exist in the mind of a reasonable person after fully, fairly, and carefully considering all of the evidence or lack of evidence. *If, from such consideration, you have an abiding belief in the truth of the charge, you are satisfied beyond a reasonable doubt.*

Clerk's Papers at 60 (emphasis added). Defense counsel objected to the phrase "abiding belief in the truth of the charge," but the court allowed the instruction, noting that it had been repeatedly approved by appellate courts.

6

During trial, the State presented testimony from Hoffman, Officer Mustain, and Officer Lohman, consistent with the facts above. The defense called only one witness—an expert on eyewitness perception and memory.

The jury found Jackson guilty on all charges. The court sentenced him to 35 months of confinement.

Jackson timely appeals.

ANALYSIS

1. INEFFECTIVE ASSISTANCE OF COUNSEL

Jackson argues, for the first time on appeal, that both the show-up and in-court identifications were obtained through unnecessarily suggestive procedures, rendering them unreliable under the totality of the circumstances in violation of due process. He frames the issue in terms of ineffective assistance: "Trial counsel's failure to move to exclude eyewitness identification testimony . . . was both deficient and prejudicial and requires reversal of Mr. Jackson's Robbery [sic] conviction." Appellant's Br. at 3-4. The State responds that this claim is unpreserved, that the identification was sufficiently reliable and therefore counsel's failure to challenge the identifications was not deficient because any motion to exclude them would not have been successful.

We agree that based on the limited record before us, the police employed unnecessarily suggestive procedures in conducting the show-up identification of Jackson. However, under the totality of circumstances, Hoffman's identification was sufficiently

7

reliable to overcome the suggestiveness. Thus, Jackson fails to demonstrate that a motion to suppress the show-up identification would have likely been granted and consequently fails to show deficient performance.

### A. Ineffective Assistance of Counsel Standards

Criminal defendants have a constitutional right to effective assistance of counsel. U.S. CONST. amend VI; WASH. CONST. art. I, § 22; *State v. Vazquez*, 198 Wn.2d 239, 247, 494 P.3d 424 (2021). "A claim of ineffective assistance of counsel may be considered for the first time on appeal."[3] *State v. Nichols*, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007). We review claims of ineffective assistance of counsel de novo. *Vazquez*, 198 Wn.2d at 249.

"Courts engage in a strong presumption counsel's representation was effective." *Id*. at 335. Moreover, "the burden is on the defendant to show from the record a sufficient basis to rebut the 'strong presumption' counsel's representation was effective." *Id*. at 337. To prevail on an ineffective assistance claim, the defendant must show both that (1) "defense counsel's representation was deficient" and (2) the "deficient representation prejudiced the defendant." *Vazquez*, 198 Wn.2d at 247-48. If either prong

---

[3] For this reason, and because Jackson frames his assignment of error in terms of ineffective assistance of counsel, the panel need not analyze whether Jackson's challenges to the identifications are unpreserved.

is not satisfied, the inquiry ends. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

Where the deficient performance is based on trial counsel's failure to make a motion, the defendant must show that a competent attorney would have made the motion, and the motion would likely have been granted. <u>In re Pers. Restraint of Davis, 152 Wn.2d 647, 711, 101 P.3d 1 (2004)</u>. This is a difficult burden to sustain when the record is undeveloped. When a defendant moves to suppress an identification before the trial court, "the defendant has the burden to establish, by a preponderance of evidence, that a police-administered identification procedure was unnecessarily suggestive." *State v. Derri*, 199 Wn.2d 658, 674, 511 P.3d 1267 (2022). Thus, "it is in the defendant's [best] interest to fully develop the record on the issue of suggestiveness." *Id*. Likewise, when a motion to suppress is brought, the State has an interest in developing the facts to oppose the motion. *See State v. D.E.D.*, 200 Wn. App. 484, 490-91, 402 P.3d 851 (2017).

Here, the question on appeal is whether counsel was ineffective for failing to file a pre-trial motion to suppress. Because a motion was not brought, we only have the record from the trial. The record on appeal does not indicate what information was available to counsel before trial and what information only became available during trial. Despite the inadequacy of the record, we consider the issue given the facts developed at trial.

B.  *Show-Up Identification Legal Standards*

"[T]he due process clause of the Fourteenth Amendment compels exclusion of eyewitness identification evidence that (1) was obtained by an unnecessarily suggestive police procedure and (2) lacks reliability under the totality of circumstances." *Derri*, 199 Wn.2d at 673.

"A show-up identification" is typically conducted "shortly after a crime occurs when police show a suspect to a witness or victim." *State v. Birch*, 151 Wn. App. 504, 513, 213 P.3d 63 (2009).  While a single-suspect identification is considered highly suggestive, show-up identifications are "not per se impermissibly suggestive." *State v. Guzman-Cuellar*, 47 Wn. App. 326, 335, 734 P.2d 966 (1987); *see Derri*, 199 Wn.2d at 674, 685. "If the defendant fails to make this showing, the inquiry ends." *Birch*, 151 Wn. App. at 514.

Variables that can affect the reliability of eyewitness identifications generally fall into two groups: "system variables" and "estimator variables." *Derri*, 199 Wn.2d at 676. "System variables" are factors within police control that can influence the process. *Id*. Research on system variables has led to widely accepted conclusions, including that: (1) identification procedures should be conducted in a double-blind manner, meaning the administrator does not know the suspect's identity, (2) police should provide pre-identification admonitions informing the witness that the perpetrator may or may not be

10

present and that they should not feel compelled to make a selection, and (3) officers should avoid giving feedback that could inflate witness confidence. *Id*. at 677.

Additionally, the court must consider "estimator variables," which are environmental or individual factors beyond police control that may affect "'an eyewitness' ability to perceive and remember an event.'" *Derri*, 199 Wn.2d at 676(quoting *State v. Henderson*, 27 A.3d 872, 904 (2011)). "Estimator variables" include: "distance, and lighting, witness characteristics (age, visual acuity, intoxication, etc.), stress, presence of a weapon, duration of observation, characteristics of the perpetrator (such as wearing a disguise or mask), delay between observation and identification, cross-racial identification, and suggestions from 'co-witnesses and others not connected to the State.'" *Id.* at 686 n.23 (quoting *Henderson*, 27 A.3d at 908).

If the court finds that the identification procedure was unnecessarily suggestive, it must next determine "whether, under the totality of the circumstances, the unnecessarily suggestive procedure created 'a very substantial likelihood of irreparable misidentification.'" *Id.* at 674 (internal quotation marks omitted) (quoting *Mason v. Brathwaite*, 432 U.S. 98, 116, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)). "'[T]he admission of testimony concerning a suggestive and unnecessary identification procedure does not violate due process so long as the identification possesses sufficient aspects of reliability.'" *Id.* (quoting *Brathwaite*, 432 U.S. at 106). Reliability is assessed using the following nonexclusive factors:

(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated at the procedure, and (5) the time between the crime and the identification procedure.

*Id*. The *Biggers* factor often overlaps with the estimator variables. *Id.* at 687.

When the "'aspects of reliability' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed." *Id.* at 674-75 (quoting *Brathwaite*, 432 U.S. at 116). Likewise, if a pretrial identification procedure is inadmissible, a later in-court identification by the same witness is admissible only if it has an "independent origin" separate from the tainted procedure. *State v. Hilliard*, 89 Wn.2d 430, 439, 573 P.2d 22 (1977).

### C. Analysis

On the limited record before us, we agree with Jackson that the show-up identification in this case employed impermissibly suggestiveness procedures. Besides having only one person in the show-up identification, it is apparent that the police did not employ a double-blind procedure when presenting Jackson to Hoffman. When Officer Lohman took Hoffman to Jackson's location, he advised Hoffman that there was "[n]o pressure either way," but this admonishment did not convey to Hoffman that Jackson might or might not be the "suspect." RP at 305. Moreover, this came after Officer Lohman informed Hoffman that they had caught up with one of her attackers. Following

Hoffman's identification, Officer Mustain provided feedback that could have inflated Hoffman's confidence in her identification by commenting along the lines of "I got to chase [or tase] the bad guy."  RP at 260-61.

Having determined that a preponderance of the evidence supports the conclusion that the show-up identification procedure was unnecessarily suggestive, we "must consider whether, under the totality of the circumstances, the unnecessarily suggestive procedure created 'a very substantial likelihood of irreparable misidentification.'"  *Derri*, 199 Wn.2d at 674 (internal quotation marks omitted) (quoting *Brathwaite*, 432 U.S. at 116).

Two of the estimator variables weigh against reliability.  First, "cross-racial identifications can be particularly unreliable."[4]  Id. at 675; State v. Allen, 176 Wn.2d 611, 622, 294 P.3d 679 (2013) (plurality opinion)).  Similarly, the stress of the attack and Hoffman's perception that Jackson might have had a firearm also weigh against reliability.

However, the remaining reliability factors heavily favor the State's position. Hoffman testified that she had a very good look at Jackson as he approached her and that she was inches from his face during the attack.  The attack lasted at least one minute, allowing for more than a fleeting glance at Jackson, even though a part of his face was

---

[4] However, Jackson cites no authority deeming a cross-racial identification per se unreliable.

covered with a mask.  Hoffman's identification occurred shortly after the crime.  Jackson

matched[5] Hoffman's description of her assailants: male, wearing all black clothing, a

mask, and a hood, riding a longboard northbound.  And Hoffman immediately identified

Jackson as her attacker after the show-up, stating, "[t]hat's the guy that pushed me first.

Yeah, that's him."  RP at 305.

Considering the totality of circumstances on the record before us, Jackson fails to

demonstrate that a motion challenging the show-up identification would likely have been

granted.  All considered, Hoffman's show-up identification of Jackson possessed

sufficient indicia of reliability to support its admission.

Next, Jackson argues that his attorney's performance was deficient for failing to

challenge Hoffman's in-court identification.  However, this argument is based on the

premise that the show-up identification was unreliable and impermissibly tainted

subsequent identifications.  We reject this argument because we do not agree with the

underlying premise.  Here, because the show-up identification was reliable, Hoffman's

---

[5] Jackson argues that Hoffman described her attackers as "thin" during her 911 call and contends that he did not match this aspect of the description, which he asserts undermines the reliability of her identification.  However, the record is insufficient to fully assess this argument.  Notably, Officer Mustain suggested that Jackson was about 6'5" and 225 pounds.  But otherwise, there are no photographs or other evidence in the record to verify Jackson's physique at the time of the incident.

14

in-court identifications were not tainted and were likewise admissible under ER 602.[6]

*See State v. Vaughn*, 101 Wn.2d 604, 611, 682 P.2d 878 (1984).

Accordingly, defense counsel's failure to move to exclude both the show-up and in-court identifications was not deficient performance. The show-up identification was sufficiently reliable to support its admission, and the in-court identifications were also admissible. Defense counsel could have reasonably concluded—just as we do—that an objection or motion to exclude was unlikely to be granted. Thus, Jackson fails to establish deficient performance. Because there is no showing of deficient performance, our ineffective assistance of counsel inquiry ends.

2.  ABIDING BELIEF JURY INSTRUCTION

Jackson contends that the use of the "abiding belief" language in WPIC 4.01 was erroneous and asks us to urge the Washington Supreme Court to reconsider the issue. However, as the State correctly notes, the Washington Supreme Court has expressly upheld the constitutionality of WPIC 4.01, including its "abiding belief" language. *See State v. Bennett*, 161 Wn.2d 303, 308-09, 165 P.3d 1241 (2007).

As an intermediate appellate court, we are bound by decisions of the Washington Supreme Court. *State v. Gore*, 101 Wn.2d 481, 486-87, 681 P.2d 227 (1984); *State v.*

---

[6] Generally, an in-court identification is admissible if the witness testifies to facts within their personal knowledge, that they personally observed. *See State v. Vaughn*, 101 Wn.2d 604, 611, 682 P.2d 878 (1984).

No. 40192-8-III
*State v. Jackson*

*Jussila*, 197 Wn. App. 908, 931, 392 P.3d 1108 (2017).  Accordingly, we conclude that

the use of WPIC 4.01 in this case was not erroneous.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Staab, A.C.J.

WE CONCUR:

_____
Fearing, J.

_____
Murphy, J.