December 29, 1992

366

CLERK OF COURT
SUPREME COURT. CNMI
FILED

92 DEC 29 A 8: 0²

BY: _____

IN THE SUPREME COURT OF THE
COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS

| | | |
|---|---|---|
| COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, | ) ) | APPEAL NO. 91-009 CRIMINAL CASE NO. 90-97 |
| Plaintiff/Appellee, | ) ) | |
| vs. | ) ) | OPINION |
| MASARO A. SAIMON, | ) ) | |
| Defendant/Appellant. | ) ) | |

Argued and Submitted May 28, 1992

Counsel for Defendant/Appellant: Pamela O'Leary Tower
Deputy Public Defender
Office of the Public Defender
Civic Center, Susupe
Saipan, MP 96950

Counsel for Plaintiff/Appellee: Julie Van Dyne
Assistant Attorney General
Office of the Attorney General
Civic Center, Susupe
Saipan, MP 96950

BEFORE: DELA CRUZ, Chief Justice, VILLAGOMEZ and BORJA, Justices.

VILLAGOMEZ, Justice:

## I.
## THE CASE

Defendant Saimon was charged with second degree murder on June 14, 1990, pursuant to 6 CMC § 1101(b). The information alleged that he murdered Erlinse Santos ("Erlinse"), his common-law wife.

369

Saimon denied shooting Erlinse and alleged that she committed suicide by shooting herself.

Prior to trial, defense counsel attempted to discover all the files of the Department of Public Safety ("DPS") regarding inmate Herbert Camacho's ("Herbert") suicide by hanging in jail. The files contained letters and statements pertaining to Herbert's intimate relationship with Erlinse and other matters related to the investigation of Herbert's suicide. Defense counsel asserted that such files were relevant to the issue of whether Erlinse committed suicide as a result of being torn between her love for Herbert and her commitment to Saimon and their children. She asserts that Erlinse' relationship with Herbert put a strain on her common-law marriage to Saimon and affected her work habits, caused her personality to change, and made her personal life troublesome.

The trial court allowed limited discovery of the DPS files, releasing only the statements of Herbert and three other persons, but sealed the rest of the files for purposes of an appeal.

Trial by jury commenced on December 11, 1990. During trial, the court admitted photographs of the decedent over the objection of defense counsel. The defense argued that the pictures were gruesome and their unfair prejudicial effect upon the jury outweighed their probative value.[1]

Appellant also now asserts that during closing argument and on cross-examination, the prosecutor made statements and asked

---

[1] Appellant should have, but did not, argue that the unfair prejudicial effect _substantially_ outweighed the probative value of the photographs. Rule 403, Commonwealth Rules of Evidence.

questions which were improper. Appellant characterizes these statements and questions as:

1. Improper comments regarding defense counsel.

2. Calling the defendant a liar and expressing a personal view of defendant's guilt.

3. Comments on defendant's failure to call witnesses.

4. Statement of sympathy for the victim and calling for justice.

5. Statements regarding facts not in evidence.

6. Asking the jury to use their own personal experience when deliberating.

7. Mischaracterizing certain testimony.

8. Misstating the evidence.

9. Knowingly using misleading and inadmissible scientific testimony.

10. Eliciting inadmissible evidence.

The jury returned a verdict of guilty as charged on December 24th, 1990. The trial court sentenced Saimon to 21 years imprisonment on March 5, 1991.

After the trial, the defense filed a motion for a new trial based upon newly discovered evidence. The evidence consisted of a letter written by Erlinse on June 3, 1990 (two weeks before her death) to her cousin, Emiko, in Phonpei. In the letter, Erlinse wrote: "It happen that last two (2) month ago I felt that I was put into love magic to hate him so much I usually think of killing myself . . . ." After a hearing on April 8th, the trial court denied the motion.

371

On April 19th, 1991 Saimon timely appealed.

## II.
## THE FACTS

Around midday on June 12, 1990, Saimon and Erlinse were at their house. They had been having communication problems earlier that day, and, as a result, Saimon had left his police work early. According to a witness, Saimon came out of the house with a handgun in his hand and fired the gun once. He then went inside the house where he argued in a loud voice with Erlinse. The witness also testified that Erlinse said "Stop it," and that Saimon shouted obscenities at Erlinse and also said "I will kill you!" After the argument, a witness heard a gunshot in the house. That gunshot killed Erlinse. Saimon had been drinking from a bottle of whiskey prior to the shooting.

The evidence indicated that there was a struggle immediately prior to Erlinse's death which had caused the fan, television, and other items to fall to the floor and Erlinse's eye glasses to break on the floor. A bullet which entered near the inside portion of Erlinse's left eye and exited at the right rear part of her head caused her death. Erlinse was right-handed.

After the gunshot in the house, Saimon came out with the handgun in his hand, got into his pick-up truck and drove away very fast. He drove to the airport, where the police came and took him in for questioning. Saimon was the only eyewitness to what occurred inside the house.

372

Four days after Erlinse's death, Herbert Camacho hung himself in his prison cell at the Division of Corrections. He left messages regarding his love relationship with Erlinse and his decision to take his own life after Erlinse died. Herbert (a long-term inmate) and Erlinse (employee of the Division of Corrections) had been lovers for some time.

## III.
## THE ISSUES

The appellant raises the following issues:

1. Whether the trial court abused its discretion in denying appellant's pre-trial motion to discover the entire file of DPS.

2. Whether the trial court abused its discretion in admitting into evidence the gruesome photographs of decedent.

3. Whether the prosecutor's comments at trial constituted misconduct which deprived defendant of a fair trial.

4. Whether the trial court abused its discretion in denying defendant's motion for a new trial.

5. Whether the cumulative effect of the above-enumerated errors denied defendant a fair trial.

## IV.
## DENIAL OF THE DISCOVERY OF THE ENTIRE DPS FILES.

The trial court reviewed in camera the DPS files and then allowed discovery of only certain statements, sealing the rest of the files for purposes of an appeal and denying discovery thereof. Appellant contends that the trial court abused its discretion by not allowing the defense to review the entirety of the files before ruling on their "scope of discovery." Brief of appellant at 9.

We disagree. We have reviewed the files and find that those portions which the trial court sealed are not relevant to the issue of whether Erlinse committed suicide, had any reason to commit suicide or had any ideation of suicide.

The statements which the trial court did order to be produced were relevant. If the materials that were sealed were relevant, then the trial court should have allowed the defense to review the files. The trial court then could hear arguments concerning the admissibility of the files and then make a ruling. See State v. Estrada, 738 P.2d 812 (Hawaii 1987). Here, since the materials sealed were not relevant or admissible, they need not be disclosed to the defense. Estrada, supra at 820.

## V.
## ADMISSION OF GRUESOME PHOTOS

The three photos admitted into evidence at trial and at issue on this appeal include Exhibit No. 24, depicting a close-up view of decedent's face while seated on a chair in her home immediately

374

after her death; Exhibit No. 5 depicting decedent's head during autopsy prosected by a metal probe showing the bullet's path; and Exhibit No. 20, depicting a broad view of decedent and the room where she was found dead.

Appellant argues that (1) the unfair prejudicial effect of the gruesome photos outweigh their probative value and (2) the same evidence could have been presented by oral testimony and non-prejudicial drawings or diagrams.[2] Appellee counters that the photos are not only relevant but are essential and their probative value is not substantially out-weighed by unfair prejudicial effect.

Rule 403 of the Commonwealth Rules of Evidence provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . . " If the probative value equals the danger of unfair prejudice, then the relevant evidence may not be excluded. The danger of unfair prejudice must be _substantially_ greater than the probative value of the relevant evidence. Rule 403, Com.R.Evid; _See_, 22 C. Wright and K. Graham, _Federal Practice and Procedure_ Sections 5214, 5215 (1978).

Regarding the trial court's application of Rule 403, Fed.R.Evid. (this is the same as our Rule 403), to the evidence, one authority has written:

---

[2] Admissibility of evidence is reviewed for abuse of discretion. _Commonwealth v. Bergonia_, No. 91-001 (N.M.I. March 19, 1992); _Guerrero v. Guerrero_, No. 90-018 (N.M.I. March 18, 1991).

375

The rule requires the judge to go through a conscious process of balancing the costs of the evidence against its benefits. Unless the judge concludes that the probative worth of the evidence is "substantially outweighed" by one or more of the countervailing factors [in Rule 403], there is no discretion to exclude; the evidence must be admitted. If, on the other hand, the balance goes against probative worth, the judge is not required to exclude the evidence but he "may" do so.

22 C. Wright and K. Graham, <u>Federal Practice and Procedure</u> Section 5214 at 263-264 (1978).

█ Photographs constitute demonstrative evidence, and therefore are admissible under Rule 403, Com.R.Evid., so long as their probative value is not substantially outweighed by their unfair prejudicial effect.

█ We have reviewed the photos, the testimonies related thereto, and the purpose for which they were offered. For the reasons set forth below, we conclude that all three photos are not only relevant but highly probative and their admission did not constitute an abuse of discretion. The photos are significantly more expressive, revealing, and probative than any of the oral testimonies or drawings. Any unfair prejudice would not substantially outweigh the probative value of the photographs.

## A. **Exhibit No. 24.**

Exhibit No. 24 (facial picture) was offered to show the condition of the area of the face where the bullet entered. Such condition relates to the factual issue of whether there was a contact wound. That is, whether the gun was in contact with the

face when it was fired.

Two medical doctors testified as expert witnesses. One said it was a contact wound and the other said it was not. The exhibit shows the condition of the wound and its surrounding area. The jury could compare the testimony of the witnesses with the condition of the face shown in the picture to determine which testimony is more consistent with the condition of the wound. See State v. Sheehan, 744 P.2d 824 (Kan. 1987) (photos admitted showed extent of victim's wounds and corroborated testimony of witnesses and pathologist); State v. Walton, 650 P.2d 1264 (Ariz.App. 1982) (photo showing whether powder burns present on victim relevant to distance between defendant and victim and therefore admissible even though gruesome).

Exhibit No. 24 therefore was relevant, highly probative, and need not be excluded as evidence.

## B. Exhibit No. 5.

Exhibit No. 5 (head picture), which shows the angle of the bullet's path, is critical to the issue of whether Erlinse shot herself. See Valentine v. State, 617 P.2d 751 (Alaska 1980) (Photo of victim admissible to show bullet's path). The government expert witness testified that the typical manner in which a person commits suicide (with a pistol) is by shooting himself/herself through the temple or the roof of the mouth.

In this case, this evidence is particularly crucial because

377

Erlinse, a right-handed person, is alleged to have shot herself near the left eye. The jury would have had to imagine Erlinse holding the pistol in her right hand, placing it against the inner portion of her left eye, and then pulling the trigger while the gun was pointing towards the right side of her head, a task that does not appear easy or simple. The jury would have to know the exact path of the bullet to realistically imagine how Erlinse supposedly shot herself.

c. Exhibit No. 20.

Exhibit No. 20 depicts the decedent as found dead on the chair in her house. It is highly probative because it shows no empty space to her right side but a large empty space to her left side. The jury could surmise from the photo that if Erlinse was in fact shot by another person, that person had to be on her left (where there is open space) and not to her right (where there was a chair, table with lamp, and a wall). That person most likely would have had to shoot her on her left side, which is where she was shot.

The photo also shows that if the defendant did take the gun from the decedent's right hand after she allegedly shot herself, as he testified at trial, it would have been unlikely that he would not notice the injury to Erlinse's left eye and the blood, because he would have had to reach over her from her left side. This is relevant in refuting the defendant's testimony that as he was taking the gun from Erlinse's hand, he did not look to see whether

378

Erlinse was injured and that he "didn't know that she was hurt."

The picture also shows the disarranged coffee table and the broken glasses on the floor, all of which are relevant to the factual issue of whether there had been a struggle between the two prior to the shooting. See People v. Young, 710 P.2d 1140 (Colo.App. 1985)(Photos which depicted interior of house in which shooting occurred were relevant and admissible because they emphasized location of furniture and nature of premises in relation to defendant, victim, and weapon); State v. Grilz, 666 P.2d 1059 (Ariz. 1933)(Photo of crime scene showing victims and scene admissible because depicted physical lay-out of crime scene); State v. Benfield, 632 P.2d 26 (Or.App. 1981) (photo of victim as found -- in chair with gunshot wound in head -- was admissible).

## VI.
## PROSECUTORIAL MISCONDUCT

Appellant argues that the prosecutor made improper comments to the jury which, either separately or cumulatively, were so prejudicial that they adversely affected his right to a fair and impartial trial. He further argues that since the evidence in this case was circumstantial, conflicting, and susceptible to two different interpretations, it is more probable that the jury was improperly influenced by the remarks of counsel. Saimon suggests that the trial court should have affirmatively intervened, sua sponte, to cure the improprieties.

If a timely objection was made at trial to an improper

379

statement, we apply a harmless error test to "consider whether it is more probable than not that the prosecutor's conduct materially affected the fairness of the trial." McKoy, 771 F.2d at 1212; see also, U.S. v. Polizzi, 801 F.2d 1543, 1558 (9th Cir. 1986); Rule 52(a), Com.R.Crim.Proc.

At trial, however, counsel for defendant did not object to the majority of the allegedly improper statements. Generally, failure to object at trial precludes appellate review. Sipsas v. State, 716 P.2d 231 (Nev. 1986). The U.S. Supreme Court has held that "counsel for the defendant cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that [the prosecutor's] comments to the jury were improper and prejudicial." United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 238-239, 60 S.Ct. 811, 851, 84 L.Ed.1129 (1940); see also, United States v. Young, 470 U.S. 1, 16 n. 13, 105 S.Ct. 1038, 1046 n. 13, 84 L.Ed.2d 1 (1985).

Even where counsel posed no objections at trial, however, we may look to each statement to determine whether it was improper, and, if so, whether it constitutes "plain error." U.S. v. Solomon, 825 F.2d at 1292, 1300 (9th Cir. 1987). A plain error is one "affecting substantial rights." Rule 52(b), Com.R.Crim.Proc.[3] See United States v. Birges, Sr., 723 F.2d 666 (9th Cir. 1984); Commonwealth v. Peters, No. 90-026 (N.M.I. Jan. 8, 1991).

---

[3] Rule 52(b) of the Commonwealth Rules of Criminal Procedure, which resembles Rules 52(b) of the Federal Rules of Civil Procedure, states that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

380

We will not lightly invoke our power to notice plain error. As the U.S. Supreme Court has written:

> The plain error doctrine of Rule 52(b) tempers the blow of a rigid application of the contemporaneous-objection requirement. The Rule authorizes the Courts of Appeals to correct only particularly egregious errors, those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings. In other words, <u>the plain-error exception to the contemporaneous-objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result</u>.

<u>United States v. Young</u>, <u>supra</u>, 105 S.Ct. at 1046 (citations and quotations omitted; emphasis supplied).

As one noted commentator has written, "[t]he power to notice plain error, whether at the request of counsel or on the court's own motion, is one that the courts exercise cautiously and only in exceptional circumstances." 3A C. Wright, <u>Federal Practice and Procedure</u>, Section 856 at 338 (1982)(footnotes omitted).

█ When we do invoke the power to review a particular statement for plain error, we review the statement against the entire record, and strive to "relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure." <u>Young</u>, 105 S.Ct. at 1046, <u>quoting</u>, <u>Johnson v. United States</u>, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943). This broad scope of review is important because "reversal on the basis of prosecutorial misconduct requires that the misconduct be so pronounced and persistent that it permeates the entire atmosphere of the trial." <u>U.S. v. McLain</u>, 823 F.2d 1457, 1462 (11th Cir. 1987).

We have reviewed, under the above-stated principles, each of the prosecutor's statements which appellant contends were improper. Based upon our review, we find that most of the prosecutor's remarks were not improper. Those statements which were improper did not amount, either separately or cumulatively, to plain error because the improper statements, "although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." Young, 105 S.Ct. at 1047.

Appellant presents for our review ten categories of allegedly improper statements. We will analyze each of these statements in turn below. Because defense counsel did not object to nine of these ten categories of statements at trial, if a particular statement was improper, we will review it for plain error. Young, supra. The final allegedly improper statement, involving a single question by the prosecutor, was objected to by defense counsel and we therefore review that statement under a harmless error standard. McKoy, 771 F.2d at 1212, see also, U.S. v. Polizzi, 801 F.2d 1543, 1558 (9th Cir. 1986); Rule 52(a), Com.R.Crim.Proc.

In performing our review, we are reminded that "while [the prosecutor] may strike hard blows, he [or she] is not at liberty to strike foul ones." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 74 L.Ed.2d 1314 (1935); see also, Young, 105 S.Ct. at 1042.

382

## 1. Improper comments regarding defense counsel.

On appeal, Saimon points to three statements by the prosecutor which he claims constitute improper comments about counsel for the defense:

> As I listened to [defense counsel] argue to you, I found myself asking a question, is he really giving you a fair reading of the evidence. And I couldn't answer that he was.
>
> . . . But what he doesn't point out to you is that Dr. Allen did not give his opinion that this was a suicide and what he doesn't point out to you is that Dr. Allen . . . is still a witness hired to act on behalf of defendant and he has a bias as a result.
>
> . . . [Defense counsel] spent quite a bit of time on the bullets in the car. On the bullets, and this is an excellent example not only of circumstantial evidence but is also the kind of questioning that is designed more to distract than it is to lead you to a reasonable doubt."

We do not agree with appellant that by these statements the prosecutor sought "to raise the inference" that defense counsel "was making up a story" or "that he lied by omission by failing to disclose information . . ." Brief of appellant at 19. The jury may have viewed the prosecutor's statements as comments on defense counsel's characterization of the evidence, not as comments on defense counsel personally. It is not necessarily improper for the prosecutor to comment that defense counsel's characterization of the evidence is incorrect. U.S. v. Hitow, 889 F.2d 1573 (6th Cir. 1989).

The prosecutor's statements were hard, but not foul blows, and were not improper. See Carol v. State, 756 P.2d 614 (Okl.Crim.

1988)(court found prosecutor's argument was directed at defense counsel's interpretation of the evidence, not at defense counsel personally); People v. Miller, 790 P.2d 1289 (Cal. 1990).

2. **Calling the defendant a liar and expressing a personal view of defendant's guilt.**

During his closing argument, the prosecutor made, at different intervals, the following statements :

> . . . The only person testifying that Erlinse Santos ever talked about suicide is this man who ran out of the house with a smoking gun in his hand. Now, is there a motive to fabricate? Ladies and gentlemen this man just shot his commonlaw wife.

> . . . That is a shocking incident in and of itself. And you ask yourselves what is the natural response to a person when they have been faced with something they have done of that nature . . . is how could I have done it, I didn't do it, I didn't do it . . . please I didn't do it. And I suggest to you that that's what Masaro Saimon started during the day he left his residence and he hasn't stopped yet.

> . . . Now do guns get magically loaded? Or is Masaro Saimon not telling us something.

> . . . Masaro Saimon was there, why can't he tell us what happened? Because he's not willing to tell the truth.

> . . . Now can you believe that? Or is Masaro Saimon not being truthful to us?

> . . . Or is Masaro Saimon not being truthful. I suggest that each question that I'm asking has one answer.

Appellant contends that through these statements, the prosecutor "asserted his personal views as to the credibility of defendant and as to defendant's guilt. . . [and] referred to

appellant as a liar." Brief of appellant at 20.

We find that the prosecutor did not improperly refer to appellant "as a liar." We read these statements as raising questions about the defendant's credibility as a witness and the veracity of his testimony by drawing reasonable inferences from the evidence presented. This is not an improper tactic.

A prosecutor may "voice doubt about the veracity of a defendant who has taken the stand where such comments are supported by the record." U.S. v. Hoelker, 765 F.2d 1422, 1426 (9th Cir.), cert. den., 475 U.S. 1024, 106 S.Ct. 1219, 89 L.Ed.2d 330 (1985). Also, the prosecutor may argue reasonable inferences from the evidence, including the inference that one of the two sides is lying.[4] U.S. v. Molina, 934 F.2d 1440 (9th Cir. 1991).

Because the defendant took the stand, the truthfulness and veracity of his testimony became the proper subject of the prosecutor's closing argument. The record supports the inference made by the prosecutor in his closing argument that Saimon may have "a motive to fabricate," that he "shot his commonlaw wife," and that he lied to the jury during his testimony. Because these inferences were reasonably drawn from the evidence, including the defendant's testimony, the prosecutor did not act improperly in making such statements.

We also fail to find that the prosecutor expressed his own

---

[4] One court has held that "[i]t is not impermissible for a prosecutor in closing argument to call the defendant a liar, provided that the term is not used to the point of excessiveness." U.S. v. Spivey, 859 F.2d 461, 466 (7th Cir. 1988).

385

personal opinion on the defendant's guilt. We recognize that it is firmly established that a prosecutor may not express his or her personal opinion on the defendant's guilt. U.S. v. McKoy, 771 F.2d 1207 (9th Cir. 1985).

In this case, the prosecutor simply did not express his evidentiary conclusions as a personal opinion. We disagree with the appellant's assertion that the prosecutor somehow expressed his personal opinion merely by inferring that Saimon's testimony was untruthful or by stating that Saimon shot his common law wife.

Also, to hold that a prosecutor's reasonable inferences from the evidence constitute his or her personal opinion on the defendant's guilt would unduly chill advocacy by leaving a prosecutor with little or no room for arguing such reasonable inferences. We decline to place such constraints on the advocacy of either the prosecution or the defense.

3. **Comments on defendant's failure to call witnesses.**

The prosecutor remarked to the jury:

> . . . They never argued; never argue and yet no one, not even he, can explain how the television was dumped over on its face, the fan thrown on the ground, the broom broken, the glasses shattered. These things happen magically?

Later, in rebutting defense counsel's closing argument, the prosecutor told the jury that the government's ballistics expert's "analysis and identification was conclusive and you have no other

experts disagreeing with him. . . . If it's so unreliable, why is there not more testimony."

Appellant contends that by these statements the prosecutor implied that the defendant had a duty to come forward with evidence, such as expert witnesses, and therefore "impermissibly shifted the burden of proof" from the government to the defendant. Brief of appellant at 23.

It is settled that in a criminal trial the government bears the burden of proving each element of its case beyond a reasonable doubt, In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), and the defendant has no duty to prove his or her innocence. State v. Traweek, 715 P.2d 1148, 1152 (Wash.App. 1986). However, the prosecutor may call attention to the defendant's failure to present exculpatory evidence and call witnesses so long as the comment is not phrased so as to call attention to the defendant's failure to testify. Territory of Guam v. Ojeda, 758 F.2d 403 (9th Cir. 1985).

In the instant case, the defendant did testify, and the prosecutor called the jury's attention to the substance of the defendant's testimony. The prosecutor's remark that "not even [the defendant] can explain" how or why certain items at the scene of the incident were found in disarray was not improper. This statement restated the evidence; on cross-examination, the defendant could not offer an explanation. Read in context of the entire closing argument, we do not read this statement as implying

387

that the defendant had a burden to offer such an explanation. Rather, we read the statement as intended to draw the jury's attention to the reasonable inference that there was, in fact, a struggle between the victim and defendant which caused the items to fall into disarray.

The other statement by the prosecutor was made during his rebuttal to the defense counsel's closing argument. The prosecutor told the jury that the ballistics expert's "analysis and identification was conclusive and you have no other experts disagreeing with him. Now you had two pathologists but you have no other experts on ballistics. If it's so unreliable, why is there not more testimony."

This statement cannot be characterized as an attempt to draw reasonable inferences from the evidence because the prosecutor was commenting on the lack of evidence, e.g. the defendant's failure to call his own expert to rebut the testimony of the government's ballistics expert. The defendant, however, had no duty to call his own expert witnesses. Because the jury may have inferred from this statement that the defendant had such a duty, it was improper. State v. Traweek, supra.

The fact that a statement is improper, however, does not mean that it prejudiced the defendant. Viewing the comment in context, we conclude that the statement does not constitute plain error. "In sum, we find that the improper remarks made by the prosecutor in closing argument did not prejudice the defense." Traweek, 715 P.2d

388

at 1153.

4. **Statement of sympathy for the victim and calling for justice.**

The prosecutor told the jury:

> Every time he says that Erlinse talked about wanting to end her life you must question, did she actually say that? Because Erlinse Santos is not here to say one way or the other. He has quieted the only voice that we could check this out. Are you going to rely on that?
>
> . . . Erlinse Santos is dead. To render a verdict of not guilty when the evidence shows otherwise is a terrible injustice to her. And its a terrible injustice to everybody in this courtroom that any single person who has committed a murder of another person should not be held accountable for, that we should not turn to that person and say, yes, you are in fact guilty of that crime, you shall answer for that crime and that's a terrible injustice.

Appellant asserts that the prosecutor used these statements to ask the jury "to convict appellant out of a sense of sympathy and justice to the victim and the community rather than relying on the evidence." The appellant argues that this was improper. Appellant also argues that the prosecutor's use of the word "we" was an improper attempt "to align himself with the jury." Brief of appellant at 23-24.

We find that the first of these two statements was directed to the defendant's lack of credibility, an inference which the prosecutor may have reasonably drawn from the evidence. This comment therefore was not improper. U.S. v. Hoelker, supra.

Appellee contends that the second statement was merely a

389

permissible emotional language "which is not only permissible, it is to be expected" in closing arguments. Brief of appellee at 27, citing, State v. Gonzales, 466 P.2d 699 (Ariz. 1970). We agree that "[e]motional language is an acceptable weapon in closing argument." State v. Griffin, 570 P.2d 1067, 1070 (Ariz. 1977). However, language which evokes sympathy for the victim is improper. Jones v. State, 738 P.2d 525, 529 (Okl.Cr. 1937). The prosector's second statement ostensibly was designed to evoke such juror sympathy and therefore was improper.

Although improper, this single call for sympathy from the jurors did not rise to the level of plain error. As noted above, the evidence for conviction was strong. And where "proof of defendant's guilt is strong, the challenged conduct or remark will not be presumed prejudicial." State v. Seeger, 479 P.2d 240 (Ore. 1971). We do not believe that this particular statement caused the defendant to suffer unfair prejudice requiring reversal.

We also do not find that the prosecutor's use of the word "we" amounted to an attempt "to align himself with the jury." The prosecutor used the word "we" but once, and in a rhetorical sense, not in the familiar sense. The prosecutor's solitary use of the term "we" was not improper.

### 5. Statements regarding facts not in evidence.

The prosecutor stated at trial:

> Masaro Saimon on the stand told us . . . that he never assaulted Erlinse Santos, that he never slapped

her, that he never yelled at her. . .

. . . All I can say is there's no lack of evidence that on June 12 he yelled at her, he assaulted her, and that he shot a gun at her.

Appellant contends these comments were improper because they "had the effect of suggesting that appellant had, on prior occasions, assaulted, slapped or yelled at his wife." Brief of appellant at 24. We disagree. The prosecutor stated what defendant testified to. That is not improper. The prosecutor then stated what defendant did to Erlinse on June 12, based on the evidence. That is also not improper. What the jury may or may not infer from such statements does not make them improper. The prosecutor did not state facts not in evidence.

5. <u>Asking the jury to use their own personal experience when deliberating.</u>

In his closing argument, the prosecutor told the jury:

The defendant's testimony starts out and asks you to believe some pretty incredible facts. The defendant related months of what anyone would consider real tough times with their wife, with the person they love. According to him, she was out all the time. According to him, she was scolding and her behavior was poor. According to him, she ignored him. And, according to him, he never, ever got angry. Now in your experience, between husband and wife, whenever you have a situation where one never gets angry, this was seething; his anger was growing.

Appellant argues that with the last sentence of this soliloquy, the prosecutor improperly asked the jury to use their

own personal experiences in their deliberations. The appellant cites State v. Troy, 688 P.2d 483 (Utah 1984). The court in Troy held that the prosecutor committed misconduct when he asked the jury "to consider and 'deliberate' matters outside the evidence." Id. at 486. In the instant case, however, the prosecutor merely inferred the jury should, at that particular moment, use "common experience and common observation" in order to understand his arguments. This is not improper. People v. Marin, 686 P.2d 1351, 1355 (Colo.App. 1983), citing, Hilton v. People, 458 P.2d 611 (Colo. 1969), cert. den., 397 U.S. 1047, 90 S.Ct. 1375, 25 L.Ed.2d 259 (1970).

The prosecutor did not ask the jury to use their common experience or observation while deliberating. Rather, he drew the jury's attention to the context of an argument which, as circumstantial evidence showed, occurred on the day of Erlinse's death. It is not improper for the prosecutor to draw the jury's attention to the familiar when drawing inferences from the evidence. It would be improper, however, if the prosecutor clearly asked the jury to use their personal experiences while deliberating. This the prosecutor did not do. The statement therefore was not improper. State v. Troy, supra.

7. **Mischaracterizing certain testimony.**

The prosecutor told the jury that Dr. Allen, the defense expert, "did not testify that in his experience he had ever seen a

392

self-inflicted gunshot into the eye." Appellant points out that Dr. Allen was never asked whether he had ever seen such a gunshot wound. Thus, the jury may have inferred from the prosecutor's statement that the lack of Dr. Allen's testimony on the issue means that Dr. Allen must have never seen such a wound. The appellant concludes that "this is tantamount to asking the jury to determine facts from evidence not produced and as such is improper." Brief of appellant at 25.

We agree that the prosecutor's statement about that which was not in evidence was improper. However, even if the jury did make the inference that appellant suggests is possible from the statement, such would not, when weighed against the body of evidence, unfairly prejudice the defendant. Therefore, the statement did not rise to the level of plain error.

### 8. Misstating the evidence.

During rebuttal, the prosecutor directed the jury's attention to the stipulation entered into by the parties regarding the presence of gunshot residue on the victim's left hand. The prosecutor told the jury:

> Look at that stipulation, that man says, either the person handled the weapon or the person was in the vicinity of the residue and he doesn't choose either one of those.

The stipulation as read into the record on Dec. 18, 1990 by defense counsel stated that:

393

From the elevated levels of antimony and barium found on the back and palm of Erlinse Santos's left hand, Mr. Doughterty would offer his opinion that she had fired a gun on the day she died, June 12, 1990, or was in the vicinity of a recently fired gun on the day she died.

Appellant argues that the prosecutor improperly misstated the evidence by his use of the word "handled" when the stipulation states "fired." We do not see how the prosecutor's use of the word "handled" can be construed as either misleading or prejudicial to the defendant when the handling of a gun includes the firing thereof. There was no plain error in this statement.

9. **Knowingly using misleading and inadmissible scientific testimony.**

At trial, defense counsel objected to a question asked by the prosecutor of Agent Riley (of the FBI) concerning why Riley had not performed an analysis of the gunshot residue on the victim's hand. The trial court sustained the objection and ruled that questions concerning the FBI lab policy were immaterial because the FBI never performed such a test. Thereafter, in response to the next question by the prosecutor, Riley explained in hypothetical terms how residue could get from the gun to a victim's hands. Defense counsel did not object to this question or the response.

On appeal, appellant states that the prosecutor's hypothetical question was improper because Riley and the FBI never tested Erlinse's hands and therefore the hypothetical had no basis.[5]

---

[5] Since defense counsel did not object to the prosecutor's hypothetical question at trial, we review the question (and the witness's response) for plain error, not harmless error.

394

Appellant's premise is that the prosecutor's line of questioning involved prosecutorial misconduct. We disagree.

The trial court allowed the line of hypothetical questioning absent any objection from defense counsel. Thus, the issue is whether the hypothetical question and the response prejudiced the defendant and rose to the level of plain error. We do not believe it did.

According to the stipulation, gunshot residue in fact was found on Erlinse's hands. It is not improper for the prosecutor to inquire of an expert how such residue could reach a decedent's hands. Also, defense counsel's failure to request curative efforts from the court (e.g., striking the question and response and/or a jury instruction) is a factor in our decision that the defendant was not prejudiced by the question or the response. See, U.S. v. Wauneka, 842 F.2d 1033 (9th Cir. 1988). We find no abuse of discretion or plain error in the trial court's decision not to intervene sua sponte, but instead to allow the questioning and testimony.

10. Eliciting Inadmissible Evidence.

During its cross-examination of the defendant, the prosecutor asked "do you know where your children are located today?" Defense counsel objected on the grounds of relevancy. At sidebar, the trial court inquired as to the relevancy of the question. The prosecutor replied that the children were at the scene of the incident and that he felt it's relevant that the jury know the

children are residing on Phonpei with the defendant's parents. The trial court sustained the objection.

Appellant contends that the prosecutor's question was prejudicial because it suggested to the jury that appellant "had sent his children away so that they could not testify against him." Brief of appellant at 29. However, we do not find that the question prejudiced the defendant for two reasons.

First, the possibility of prejudice to the defendant was eliminated by the fact that the objection was lodged and sustained before the defendant answered the question. U.S. v. Buckley, 934 F.2d 84 (6th Cir. 1991). Second, the jury neither heard any answer nor the prosecutor's offer of proof at sidebar.

Appellant also argues that although defense counsel failed to object to most of the prosecutor's statements at trial, the trial court "had a separate affirmative obligation to intervene sua sponte to ensure that final argument is kept within the proper bounds." Brief of appellant at 30. This may be so if the prosecutor's conduct had been so egregious as to constitute plain error. But there was no plain error in this case. Therefore, the trial court had no reason to intervene.

We will not put such reigns on the trial court's discretion, especially where counsel for defense had the primary duty and first opportunity, but failed, to make appropriate objections at trial. Although the trial court must correct that which is obviously prejudicial, it need not perform the essential functions of defense counsel.

396

## VII.
## DENIAL OF THE MOTION FOR A NEW TRIAL

Defendant moved for a new trial based on a post-trial discovery of Erlinse's letter to her cousin in which she wrote: "It happen that last two (2) months I felt that I was put into love magic to hate him so much I usually think of killing myself. . . ." The trial court denied the motion. Appellant contends that the trial court abused its discretion in denying the motion. It follows that the standard of review is abuse of discretion. Commonwealth v. Hanada, No. 90-029 (N.M.I. Oct. 24, 1991); Robinson v. Robinson, No. 89-012, 1 N.Mar.I. 32 (N.M.I. Feb. 5, 1990).

Appellant argues that he met each requirement of the five-part test applied to a motion for a new trial. That is, (1) the evidence was discovered after trial; (2) failure to discover it at time of trial was not due to his lack of diligence; (3) the evidence is material to the issue of suicide; (4) it is not cumulative; and (5) a new trial would probably result in a different outcome. He argues that if the letter is shown to the jury, it might raise reasonable doubt in the jurors' minds as to suicide ideation.

Appellee counters that (1) this motion is not favored by the courts and are viewed with great caution; (2) reversal is denied unless the trial court clearly acted arbitrarily, capriciously, or upon an erroneous concept of law, which it did not; (3) the trial court's decision is based upon its observations of the evidence adduced at trial and consideration of the new evidence; (4) the new evidence is cumulative; and (5) it would not likely result in an

acquittal of the defendant.

We hold that the trial court did not abuse its discretion. A reading of the specific sentence cited by appellant in the letter might give one impression, but the content of the whole letter negates any implication of suicidal contemplation or ideation by Erlinse. The letter discusses future plans about taking a trip, building a house, keeping the family happy, and possibly moving to the states.

In addition, the trial court could have reasonably determined that the new evidence would have been cumulative in light of the other evidence already admitted regarding the decedent's suicidal tendencies, change of behavior, depression, and so forth. See Pangelinan v. Unknown Heirs of Mangarero, No. 90-015, 1 N.Mar.I. 141 (N.M.I. Nov. 1, 1990).

Finally, the key factual issue before the jury was who pulled the trigger -- Saimon or Erlinse. Based on the record, we find the jury's verdict substantially supported by the evidence. Thus, the trial court could have reasonably concluded that the new evidence would not likely result in an acquittal.

## VIII.
## CUMULATIVE ERROR

Appellant contends that even if we find each of the above errors to have been harmless, their cumulative effect served to deny him his right to a fair and impartial trial. Cumulative error, in certain cases, may require reversal. See, e.g., U.S. v. McLain, supra (reversed convictions because "the cumulative effect

398

of the errors committed by the judge and prosecutor . . . denied the defendants a fair trial." Id. at 1462).

We have concluded that there was no error with respect to the trial court's denial of defendant's pretrial motion for discovery, its admission of the photographs and its denial of defendant's motion for a new trial. We also have concluded that most of the prosecutor's statements were not improper, and those that were improper did not constitute plain error. Therefore, there is no cumulative error.

IX.

For the reasons given above, we AFFIRM in all respects.

Dated this 29th day of December, 1992.

_____
JOSE S. DELA CRUZ, Chief Justice

_____
RAMON G. VILLAGOMEZ, Associate Justice

_____
JESUS C. BORJA, Associate Justice